UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHNSON-LANCASTER AND )
ASSOCIATES, INC., )
          Plaintiff, )
) No. 1:16-cv-1201
-v- )
) Honorable Paul L. Maloney
GREAT LAKES STAINLESS, INC., )
          Defendant. )
)

## OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff Johnson-Lancaster and Associates was a sub-contractor for a dining hall construction project at the University of Colorado at Boulder. Johnson-Lancaster contracted with Defendant Great Lakes Stainless for custom fabrication services and equipment. The relationship between Johnson-Lancaster and Great Lakes ultimately broke down and Johnson-Lancaster asked Great Lakes to refund the deposit money it had sent. Great Lakes declined to do so. Johnson-Lancaster then filed this lawsuit, which includes a claim for statutory conversion and a claim for common law conversion. Because there are questions of fact as to whether Great Lakes' decision to keep the money was wrongful, the Court will deny Johnson-Lancaster's motion for partial summary judgment.

I.

This lawsuit and the motion now pending require the Court to consider the terms of the agreement between the parties. Attached to the complaint are six exhibits. Johnson-Lancaster (JLA) filed this as a motion for judgment on the pleadings. (ECF No. 18.) JLA

attached five of the six exhibits to the motion. To its response (ECF No. 20), Great Lakes Stainless (GLS), attached seven different exhibits, including an affidavit and multiple email chains. The Court concluded that the exhibits presented matters outside the pleadings and issued a notice to the parties that the motion would be converted to one for summary judgment.[1] (ECF No. 24.) The parties were given a deadline for filing any additional material pertinent to the motion. GLS filed another response, and included additional exhibits. (ECF No. 25.) JLA then filed another reply. (ECF No. 27.)

## II.

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories and admissions, together with the affidavits, show there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a) and (c); *Payne v. Novartis Pharms. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014). The burden is on the moving party to show that no genuine issue of material fact exists, but that burden may be discharged by pointing out the absence of evidence to support the nonmoving party's case. Fed. R. Civ. P. 56(c)(1); *Holis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531, 543 (6th Cir. 2014). The facts, and the inferences drawn from them, must be viewed in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (quoting *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Once the moving party has carried its burden, the nonmoving party must set forth specific facts in the record showing there is a genuine issue

---

[1] As part of its response to the Rule 12 motion, and in reliance on its documentary evidence, GLS requested the Court grant summary judgment in its favor. (ECF No. 20 Resp. at 8 PageID.135.)

for trial. *Matsushita*, 475 U.S. at 574; *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 200 (6th Cir. 2010) ("After the moving party has met its burden, the burden shifts to the nonmoving party, who must present some 'specific facts showing that there is a genuine issue for trial.'") (quoting *Anderson*, 477 U.S. at 248). In resolving a motion for summary judgment, the court does not weigh the evidence and determine the truth of the matter; the court determines only if there exists a genuine issue for trial. *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Anderson*, 477 U.S. at 249). The question is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-252.

III.

The evidence in the record establishes that the following facts are not in dispute. Generally, these undisputed facts are memorialized in email exchanges between the parties. On October 26, 2015, GLS sent JLA an email with an "updated quote" (ECF No. 1-1 PageID.10) for equipment for the dining hall construction project. (ECF No. 1 Compl. ¶¶ 5–7 PageID.2; ECF No. 7 Ans. ¶ 7 PageID.47.) The sixteen-page attachment to the email included a description of each item and a price for each item. (ECF No. 1-1 PageID.12–25.) GLS included an introductory paragraph before the list of items, which provided, in part, these statements:

> Engineering will not begin drawings until a purchase order is received by Great Lakes Stainless, Inc. A 10% engineering fee will be charged for items that are cancelled after shop drawings are complete. A request for a corrected quote must be made if Customer finds any items are missing, or the quantities are incorrect on the quote. Any obvious errors or omissions in the quotation are subject to change. Prices are valid from 90 days from the above quotation date. 20% Deposit Required Upon Completion Of Shop Drawing.

3

(ECF No. 1-1 PageID.11.) After the list of items, GLS included a page titled "Terms and Conditions." (*Id.* PageID.26.) The total for the quote was $1,312,271.51. (*Id.* PageID.25.)

On December 2, 2015, GLS sent JLA an email with "revised pricing" that was hopefully "closer to the number you were looking for[.]" (ECF No. 1-2 PageID.28.) The attachment was a two-page, single-spaced list of items and prices totaling $954,498. (*Id.* PageID.29–30.) This attachment did not include the introductory paragraph or the page of terms and conditions. JLA responded the next day, December 3, 2015, stating that it would "get you a LOI based $954,498 price and follow-up with a purchase order." (ECF No. 1-3 PageID.32–33.) On December 22, 2015, JLA sent GLS the following email:

> This email will be our Letter of Intent to purchase the CU project from you in the agreed upon amount of $954,498.00. Please start the show drawings ASAP. I will review a previous email from Megan and start sending over the information that she needs.

(ECF No. 20-2 PageID.141.)

Between January and March 2016, GLS sent six additional quotes to JLA. (ECF No. 21 DeBruyn Affidavit ¶ 4 PageID.166.) Each of the six additional quotes was sent either in response to changes made by JLA to the list of items in the revised pricing list or in response to inquiries about the change in price if a modification were made to the list of items. (ECF No. 21 PageID.170–88.) The six additional quotes contained the same introductory paragraph and the same terms and conditions as the updated quote sent on October 26, 2015.[2]

---

[2] Quote 44008 dated 1-12-16 PageID.171–72;
Quote 44055 dated 1-20-16 PageID.174–75;

In the middle of March 2016, JLA began pressing GLS for the shop drawings, which prompted GLS to press JLA for a purchase order. On March 9, GLS sent an email stating that the drawings were "on track" to be ready by March 28, and asked "[w]ill you be sending a PO over as well? I note we just have a letter of intent as of now." (ECF No. 20-3 PageID.145.) On March 18, GLS informed JLA that the drawings would be ready on Monday, March 21. (*Id.* PageID.144.) Then, on March 21, GLS asked for an update on the status of the purchase order because it would like "to send over the drawings." (*Id.*) JLA responded "POs are not cut until shop drawings are approved. That's why we do the letter of intent." (*Id.*) The next day, on March 22 at 1:12 p.m., JLA told GLS that it needed the shop drawings no later than Friday. (*Id.* PageID.146.) At 2:35, GLS responded, stating that it needed "a PO for the job before we submit the drawings as it is our company policy." (*Id.* PageID.148.) John Daniel with JLA was told to call Michael with GLS to further discuss the issue. (*Id.* PageID.148 and 149.)

On March 25, GLS provided JLA with the shop drawings and with an invoice. Emails exchanged that day indicate that GLS electronically sent JLA the drawings. (ECF No. 20-4 PageID.155.) An invoice dated March 25 was sent to JLA for $95,450. (ECF No. ECF No. 20-6.) The description box on the invoice contains the following statement: "- 10% deposit

---

Quote 44063 dated 1-21-16 PageID.178 (exhibit contains introductory paragraph only);
Quote 4168 dated 2-12-16 PageID.181–82;
Quote 44233 dated 2-24-16 PageID.184–85; and
Quote 44333 dated 3-16-16 PageID.187–88.

5

on 954,500 (per agreement between Michael Debruyn & Brad Lancaster)[.]" (*Id.*) JLA ultimately paid the deposit money.[3]

In June, GLS began expressing concerns to JLA that GLS had not received information necessary to fabricate the items needed for the job. On June 9, GLS sent an email to JLA noting that "we are rapidly approaching some critical milestones." (ECF No. 20-5 PageID.157.) GLS asserted that it would need "full approvals" to meet established delivery dates. (*Id.*) GLS stated that did not currently have approved prints, approved materials, a purchase order, had not yet received the deposit, and did not have a schedule for templates and field dimensions. (*Id.*) GLS included a table identifying parts of the project, the date by which final approval was necessary and the date for delivery. (*Id.*) JLA responded that field measurements for the first floor would be taken in mid-June. (*Id.* PageID.158.) JLA explained that the second floor was still under construction. (*Id.*)

In August, the relationship between JLA and GLS broke down. On August 10, JLA emailed GLS a preliminary schedule of ship dates. (ECF No. 1-5 PageID.37.) After a brief internal meeting, GLS recommended to JLA that JLA "have the other shop build it." (*Id.*) The email is not entirely clear, but it appears that GLS had scheduled other work based on when the project for JLA was initially scheduled to be completed. Because the JLA project had experienced delays, GLS could not "accelerate the schedule." (*Id.*)

JLA concluded it would need to have another fabricator perform the work. On August 17, JLA asked GLS to "ship all buy-outs that you have in you [sic] possession as well

---

[3] In its answer to the complaint, GLS asserts that it received the deposit money on August 9, 2016. (ECF No. 7 ¶ 13 PageID.48.) JLA does not assert when it paid the deposit money.

as our approximately $100,000[.]" (ECF No. 1-6 PageID.39.) GLS has refused to return the money. (Compl. ¶ 24 PageID.4; ECF No. 7 Ans. ¶ 24 PageID.49.)

IV.

Michigan recognizes both a common law claim for conversion and a statutory claim for conversion. "[T]he scope of a common-law conversion claim is now well-settled in Michigan law as 'any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein.'" *Aroma Wines & Equip., Inc. v. Columbian Distrib. Servs., Inc.*, 871 N.W.2d 136, 144 (Mich. 2015) (citation omitted). Michigan's conversion statute reads, in part:

> (1) A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees:
>
> > (a) Another person's stealing or embezzling property or converting property to the other person's own personal use.

Mich. Comp. Laws § 600.2919a. Statutory conversion claims allow a plaintiff to recover treble damages and attorney fees, but, unlike the common-law conversion claim, the plaintiff must show that the defendant converted the property for his or her own personal use. *Tyson v. Sterling Rental, Inc.*, 836 F.3d 571, 581 (6th Cir. 2016) (citing *Aroma Wines*, 871 N.W.2d at 146–48). "To support an action for conversion of money, the defendant must have an obligation to return the specific money entrusted to his care." *Head v. Phillips Camper Sales & Rental, Inc.*, 593 N.W.2d 595, 603 (Mich. Ct. App. 1999). And, the "defendant must have obtained the money without the owner's consent to the creation of a debtor and creditor relationship." *Id.* (quoting *Citizen's Ins. Co. v. Delcamp Truck Ctr., Inc.*, 444 NS.2d 210,

213 (Mich. Ct. App. 1989) (per curiam)). The money need not be earmarked for return and, when an individual cashes a check and retains the full amount, even where he is entitled only to retain a portion, the person who wrote the check has a claim for conversion. *Citizen's Ins. Co.*, 444 N.W. 2d at 213.

JLA advances four arguments in support of its motion, none of which establish a lack of genuine issue of material facts.

First, JLA claims the manner in which GLS answered the complaint requires the Court to accept the assertion that the deposit was "entrusted" to GLS pending fabrication of the equipment. JLA asserts that because GLS "neither admits nor denies" the allegation in paragraph 14, the allegation is admitted. But, in its answer to paragraph 14, GLS also referenced its answer to paragraph 13. And, in paragraph 13, JLA admits that there exists an invoice for a 10% deposit per an agreement between Debruyn and Lancaster. Nowhere in the invoice is the word "entrusted" used. The invoice says the money is a deposit on $954,500. JLA's first argument does not establish the lack of a dispute about whether GLS had a duty to return the specific deposit.

For its fourth argument, JLA asserts that GLS cannot, in good faith, deny that it has converted the deposit. JLA is simply incorrect, GLS can, and has, denied that it converted the deposit. GLS does not deny that it kept the money. GLS disputes whether it has an obligation to return the money.

For its second and third arguments, JLA discusses the terms and conditions in the documents exchanged between the parties and also the viability of various contractual provisions. JLA argues that none of the documents exchanged between the parties clearly

and unambiguously provide that the deposit was subject to forfeiture.[4] JLA and GLS dispute whether the terms and conditions exchanged between the parties were rejected by JLA or incorporated into the agreement between the parties. JLA and GLS also dispute whether GLS performed any work on the Equipment. Although GLS may not have fabricated any equipment, GLS maintains it produced the shop drawings, templates and samples. GLS also states that it spent approximately 500 hours on the project and expended approximately $61,000 out of pocket (ECF No. 20-1 Debruyn Affidavit ¶ 7 PageID.138–39). JLA then argues that forfeitures are not favored in contract law, citing, *inter alia*, *Moore v. St. Clair Cty.*, 328 N.W.2d 47, 49 (Mich. Ct. App. 1982). JLA also insists that parties to a contract cannot agree to unreasonable sums as damages for breaches to a contract, citing, *inter alia*, *Curran v. Williams*, 89 N.W.2d 602, 604 (Mich. 1958).

On the record before this Court, the terms and conditions of the agreement between the parties are in dispute. On at least seven occasions between October 2015 and March 2016, GLS sent JLA lists of prices for goods and services, in which GLS also informed JLA that cancellation after shop drawings are complete will result in a 10% engineering fee. For this motion, JLA has not asked the Court to resolve the "battle of the forms." For this motion, JLA ignores those emails. GLS has filed a counter-claim for breach of contract, among others. If GSL were to establish that the agreement between the two parties permits

---

[4] In its answer to paragraph 24 of the complaint, GLS states that "forfeiture is appropriate per the terms and conditions, as agreement upon and demonstrated by the conduct of the parties." (ECF No. 7 ¶ 24 PageID.49.)

GLS to retain the deposit, GLS could not be found liable for common law or statutory conversion; its retention of the deposit would not be wrongful.

Finally, JLA's reliance on contract law to support its claim for conversion is largely inapposite. The Court, and the parties, must keep in mind that Michigan law will generally not support a claim for conversion where the parties' relationship is governed by an agreement. Under Michigan law, it is "well-settled that an action in tort requires a breach of duty separate and distinct from a breach of contract." *Brock v. Consol. Biomedical Labs.*, 817 F.2d 24, 25 (6th Cir. 1987) (collecting cases); *see Oak Street Funding, LLC v. Ingram*, 511 F. App'x 413, 417–18 (6th Cir. 2013); *Sudden Serv., Inc. v. Brockman Forklifts, Inc.*, 647 F. Supp. 2d 811, 815 (E.D. Mich. 2008). Where the plaintiff's property right arises entirely from his or her contract rights, the plaintiff does not have a claim for conversion. *Llewellyn-Jones v. Metro Prop. Group, LLC*, 22 F. Supp. 3d 760, 788 (E.D. Mich. 2014). To maintain a conversion claim where the parties also have an agreement, the plaintiff needs to show "a relation exists which would give rise to a legal duty without enforcing the contract promise itself[.]" *Brewster v. Martin Marietta Aluminum Sales, Inc.*, 378 N.W.2d 558, 569 (Mich. Ct. App. 1985). If the parties have a contract, then JLA needs to show that GLS violated some duty independent of the contract to prevail on its conversion claim. JLA cannot prevail on its conversion claims by establishing that contract law will not permit GLS to keep the money as a penalty, a forfeiture, or as liquidated damages.

V.

JLA has not established that it is entitled to summary judgment for its conversion claims. There remain genuine issues of material fact about the terms of the agreement

between the parties.[5] If the terms of the agreement permits GLS to retain the deposit, JLA cannot prevail on its conversion claims.

# ORDER

For the reasons provided in the accompanying Opinion, JLA's motion for partial summary judgment (ECF No. 18) is **DENIED**.

**IT IS SO ORDERED.**

Date:  September 20, 2017                                         /s/ Paul L. Maloney
                                                                                    Paul L. Maloney
                                                                                    United States District Judge

---

[5] GLS did not separately file its own motion for summary judgment. The Court has not given notice that it has considered granting summary judgment in favor of GLS. *See* Fed. R. Civ. P. 56(f). The same genuine issues of material fact would preclude this Court from dismissing the conversion claims in GLS's favor.